DEAN M. CONWAY (DC Bar No. 457433)
*pro hac vice pending*
Email:  ConwayD@sec.gov
KEVIN GUERRERO (AZ Bar No. 023673)
*pro hac vice pending*
Email:  GuerreroK@sec.gov
EMILY SHEA (DC Bar No. 1010479)
*pro hac vice pending*
Email: SheaE@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549
Telephone: (202) 551-4412
Facsimile: (202) 772-9245

LOCAL COUNSEL
Stephen T. Kam (Cal. Bar No. 327576)
Email: KamS@sec.gov
Securities and Exchange Commission
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>            Plaintiff,<br><br>      v.<br><br>TERREN S. PEIZER and ACUITAS GROUP HOLDINGS, LLC,<br><br>            Defendants. | Case No.<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Securities and Exchange Commission ("SEC") alleges as follows:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b) and 77v(a)], and Sections 21(d), 21(e), 21A, and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e), 78u-1, and 78aa].

2.      Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

3.      Venue is proper in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain of the transactions, acts, practices, and courses of conduct constituting violations of the federal securities laws occurred within this district.

## SUMMARY

4.      This SEC enforcement action involves unlawful insider trading in the securities of Ontrak, Inc. ("Ontrak") by the healthcare treatment company's Executive Chairman, Terren S. Peizer, pursuant to two trading plans purportedly established under Rule 10b5-1 of the Exchange Act in the name of his personal investment vehicle, Acuitas Group Holdings, LLC ("Acuitas").

5.      In May through August 2021, Peizer adopted these trading plans and sold a total of 641,357 shares of Ontrak stock while he was aware of material nonpublic information—specifically, that Customer A, Ontrak's then-largest customer, had been communicating confidentially to key Ontrak personnel that it was dissatisfied with Ontrak and that it was increasingly likely to terminate its contract with Ontrak.

6.      This nonpublic information regarding Customer A was particularly important because, among other reasons, Ontrak had publicly announced just a few months earlier that another major Ontrak customer was terminating its contract.  Upon

1

the news of that customer's termination, Ontrak's stock price declined over 46%.

7.     Ontrak is a behavioral health company that contracts with health plans to identify members whose chronic disease will improve with behavior change, and then provides those members with additional healthcare solutions.  Ontrak earned revenue through fees it charged to its health plan customers, like Customer A, based on the number of the customers' own members that were enrolled in the Ontrak program. Ontrak has incurred significant net losses and negative operating cash flows since its inception in 2003, and its ability to fund its ongoing operations was dependent on increasing the number of members that enroll in the Ontrak program.  By March 2021, Ontrak's business was dependent on three large customers, including Customer A, such that Ontrak disclosed at the time that "the loss of any one of such customers would have a material adverse effect on us."

8.     When Ontrak ultimately disclosed publicly on August 19, 2021 that an unidentified customer—in actuality, Customer A—was terminating its contract, Ontrak's stock price declined more than 44% from the prior trading day.

9.     By that time, Peizer and Acuitas had sold over $20 million of Ontrak stock since May 2021, avoiding losses of over $12.7 million.

10.     Peizer purported to establish two stock sales plans pursuant to Exchange Act Rule 10b5-1 [17 C.F.R. § 240.10b5-1], but Defendants cannot rely on the affirmative defense set forth in the rule because, among other reasons, Peizer was aware of material nonpublic information when he adopted the trading plans.

11.     By engaging in the conduct alleged in this Complaint, Peizer and Acuitas violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Peizer is also liable as a control person pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for Acuitas's Exchange Act violations.

12.     The SEC seeks  final judgments: (a) permanently enjoining Defendants from violating the federal securities laws and rules this Complaint alleges they have violated;

(b) ordering Defendants to disgorge all ill-gotten gains they received as a result of the violations alleged pursuant to Exchange Act Sections 21(d)(3), (d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5) and 78u(d)(7)], and to pay prejudgment interest thereon; (c) ordering Defendants to pay civil money penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1]; (d) ordering Defendant Peizer barred from serving as an officer and director of a public securities issuer pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]; and (e) ordering any other and further relief the Court may deem just and proper.

## DEFENDANTS

13.     **Terren S. Peizer**, age 63, resides part-time in Santa Monica, California, in this district.  He is the founder, Executive Chairman, and Chairman of the Board of Directors of Ontrak.  From Ontrak's inception in 2003 through April 11, 2021, and from August 12, 2022 through the present, Peizer has also served as Ontrak's CEO.

14.     **Acuitas Group Holdings, LLC**, incorporated in California with its principal place of business in Santa Monica, California, in this district, is Peizer's personal investment vehicle.  Peizer owns 100% of Acuitas and is its Chairman and sole member.

## RELATED ENTITIES

15.     **Ontrak, Inc.**, incorporated in Delaware with its principal place of business in Henderson, Nevada, is a virtualized outpatient healthcare treatment company.  Until March 2022, Ontrak's principal place of business was in Santa Monica, California. Shares of its common stock are registered pursuant to Section 12(b) of the Exchange Act and are quoted on the NASDAQ Global Market under the symbol "OTRK."

16.     **Customer A**, incorporated in Delaware with its principal place of business in the United States, is a global health services company.

17.     **Customer B**, a subsidiary of a company incorporated in Delaware with its principal place of business in the United States, is a health services company.

**FACTS**

A.      **Peizer's Duty of Confidentiality to Ontrak and Its Shareholders**

18.      As Executive Chairman, Peizer owed Ontrak and its shareholders a duty to keep confidential material, nonpublic information concerning Ontrak.

19.      Ontrak had an Insider Trading Policy in effect in May through August 2021 (the "Relevant Period") which applied to its "directors, officers and other employees." The policy specifically listed Peizer as a director subject to the policy, and listed Acuitas as a "designated insider" due to its position as a "beneficial owner of over 10% of shares" of Ontrak.

20.      Ontrak's Insider Trading Policy stated: "No Insider shall engage in any transaction involving a purchase or sale of the Company's securities, including any offer to purchase or offer to sell, during any period commencing with the date that he or she possesses Material Nonpublic Information concerning the Company and ending at the open of business on the second full Trading Day following the date of public disclosure of that information, or at such time as such nonpublic information is no longer material."

21.      Ontrak's Insider Trading Policy explained that "information should be regarded as material if there is a reasonable likelihood that it would be considered important to an investor in making an investment decision regarding the purchase or sale of the Company's securities."  Significantly, Ontrak's Insider Trading Policy included as an example of material nonpublic information a "[m]aterial agreement (or termination thereof)."

22.      With respect to Rule 10b5-1 trading plans at Ontrak, Ontrak's Insider Trading Policy provided: "Where a valid 10b5-1 plan has been established **at a time when the Insider was not in possession of material non-public information**, trades executed as specified by the plan do not violate the securities laws or this Policy even if the insider is in possession of material non-public information at the time the trade is executed."  (emphasis added.)

23.      In a "board-approved" Code of Ethics and Business Conduct, dated May

2021 and filed with the SEC in August 2021, Ontrak stated in a section entitled "Insider Trading Policy" that:

> Directors, officers, and employees who have access to material non-public information relating to [Ontrak] are not permitted to use or share that information for stock trading purposes or for any other purpose except the conduct of [Ontrak's] business. All non-public information about [Ontrak] should be considered confidential information.  To use nonpublic information for personal financial benefit […] is not only unethical and against [Ontrak] policy but is also illegal.  This policy applies to all directors, officers, and employees and extends to activities both within and outside their duties to [Ontrak], including trading for a personal account.  Directors, officers, and employees also should comply with any insider trading policies and procedures adopted by [Ontrak].

24.    In that "board-approved" Code of Ethics and Business Conduct, dated May 2021, Ontrak further stated that "each director, officer, and employee should be familiar with and abide by [Ontrak's] separate Insider Trading Policy."

25.    During the Relevant Period, Ontrak provided current versions of its "Insider Trading Policy" to Peizer, given that he was Executive Chairman of Ontrak's board of directors at the time and presumably would have reviewed and consented to what Ontrak later publicly disclosed as its "board-approved" Code of Ethics and Business Conduct.

26.    Peizer provided Ontrak with written acknowledgements that he had received and agreed to abide by Ontrak's "Insider Trading Policy" that was in effect during the Relevant Period.  Attached to Ontrak's "Insider Trading Policy" was a "Receipt and Acknowledgement," which stated: "All employees, directors, officers of Ontrak, Inc. ('Ontrak') and any outside third parties designated as Insiders are responsible for reading, understanding and following the guidelines outlined in the Ontrak Insider Trading Policy.

Please sign and return this page acknowledging receipt the [sic] Insider Trading Policy."

27.     Peizer previously acknowledged that he received and would comply with the insider trading policy for Ontrak's predecessor company, Hythiam, Inc., on May 8, 2006.

### B.     Customer A's Contractual Relationship with Ontrak Was Material

28.     Ontrak is a behavioral health company that contracts with health plans to identify members whose chronic disease will improve with behavior change, and then provides those members with additional healthcare solutions.  Ontrak's revenue is generated from fees charged to its health plan customers, based on the number of the customers' own members that are enrolled in the Ontrak program.

29.     Ontrak has incurred significant net losses and negative operating cash flows since its inception in 2003.  As noted in its 2020 annual report, filed on Form 10-K with the SEC on March 9, 2021, Ontrak's "ability to fund [its] ongoing operations is dependent on increasing the number of members that enroll in the Ontrak program."

30.     As of December 31, 2020, Ontrak's revenue was highly concentrated from four customers.  As Ontrak stated in its 2020 annual report: "Our business currently depends upon four large customers; the loss of any one of such customers would have a material adverse effect on us."

31.     On March 1, 2021, Ontrak announced that Customer B, its then-largest customer, had notified Ontrak that it would be terminating its contract effective June 26, 2021.  That day Ontrak's stock price closed at $31.62 per share, down more than 46% from the prior trading day, on exponentially higher volume of 10,458,100 shares.

32.     As of March 1, 2021, Peizer, through Acuitas, owned 9,709,882 shares of Ontrak common stock.  Peizer lost over $265 million in the value of his shares in a single day when Ontrak announced the loss of Customer B.

33.     After the loss of Customer B, Ontrak's relationship with Customer A, its next-largest customer, became even more important to Ontrak and its investors.

34.     In the March 1, 2021 press release announcing Customer B's termination, Peizer stated that despite the loss, "[we] have significant tailwinds as we enter 2021."

Specifically, Peizer touted Ontrak's contract with Customer A, noting that it "is expected to drive our 2021 growth, and our current enrollment already tops 5,000 members." According to the press release, Customer A's members amounted to 67% of all remaining participants in the Ontrak program.

35.     An analyst that covered Ontrak highlighted the risk of Ontrak's increased reliance on Customer A, texting Peizer on March 2, 2021, "All I know is that 8400 [Customer B members] is going away and now [Customer A] at 5000 and growing is about half the business. We need to see other payers combine for a majority of the business thus diminishing this risk in the future."

36.     Similarly, at a March 1, 2021 healthcare conference, Ontrak officers said that they hoped to make up for the loss of Customer B by expanding Ontrak's contract with Customer A and enrolling more Customer A members.  For example, an Ontrak officer stated that Customer A was "obviously going to be the big driver in replacement of the [Customer B] revenue this year."  The officer explained that Ontrak had revised its 2021 revenue estimate to $100 million and that "[Customer A] expanding and launching very fast and hoping to continue that, continued enrollment rate increases and then the strongest pipeline we've had in the history of the company that we can hopefully meet and exceed that $100 million."  Another Ontrak officer previewed a potential expansion of the Customer A contract, saying, "[w]ith the existing [Customer A] contract, there's 3 additional states in the Medicare Advantage space that we'll be looking at" and that Ontrak was "aggressively pursuing expansions with existing clients, particularly targeting [Customer A] on the commercial side."

37.     On a March 9, 2021 earnings call, Peizer and other Ontrak officers continued to reiterate Customer A's critical role in replacing lost revenue from Customer B and growing Ontrak's business.  Peizer described "the 5 tailwinds that will be important to our growth trajectory"—"[f]irst, we have seen very rapid enrollment of Medicare Advantage members under our [Customer A] contract, which "contributed to our fourth quarter revenue growth."  Peizer also noted that Ontrak "anticipate[s] demand

for broader engagement with [Customer A]'s members."  Another Ontrak officer stated
that "with [Customer A], for example, there's additional states that they've moved into.
We're looking to expand, and they're asking us to bring our services into those states for
their members."  The officer also stated that "we're continuing to pursue expansions with
large national plans like [Customer A] with their commercial business."

38.     When asked about the potential revenue from the contract with Customer A,
an Ontrak officer responded during the March 9, 2021 earnings call, in which Peizer
participated:

> [W]e are definitely out of the gate fast. We've already had
> conversations or started conversations with this customer about how we can
> think about this moving forward.  The overall business – the overall contract
> was scoped at around $90 million for over 3 years.  At the beginning, if you
> just flatline that, that sounds like $30 million a year.  And at the very
> beginning, we started talking about we believe that [Customer A] could be
> about $40 million for the first year, for 2021.  And it appears we're moving
> faster than that.  And so that's why we're having the conversations.  We
> look to a little bit of history to say what's the likelihood of [Customer A]
> saying keep going.  Early indications are positive.  And so the intent is,
> together with expansions into some new states that [another Ontrak officer]
> had mentioned with them that we will come to a conclusion that this is great
> for all their members as well as [Customer A] itself, and we can move that
> forward and increase the overall scope of the contract.

39.     Ontrak officers also conveyed in the March 9, 2021 earnings call, which
Peizer participated in, that the loss of Customer B was an isolated incident that did not
portend other customer terminations.  An Ontrak officer stated:

> We've proactively outreached both to existing clients as well as in potential
> discussions, explaining against what we know about the process and the
> decision that [Customer B] took.  And there has been no concern expressed

from existing clients and the conversations with potential folks in the pipeline based on analysis specific to their businesses and their members continuing forward.  So we haven't seen any headwinds so far associated with the loss of [Customer B] with other customers or prospects.

40.     When asked about the possibility of additional customer terminations, an Ontrak officer replied: "we proactively reached out to explain what we saw with the [Customer B] contract ending and how – get feedback from our clients.  And again, the consistent feedback was we are doing the right things.  We're continuing to drive value based on their businesses, and there are no challenges at this moment."

41.     Analyst reports after Ontrak's March 9, 2021 earnings call highlighted the importance of Customer A and Ontrak's assertions that no further customer terminations were likely.  For example, one analyst stated:  "We're incrementally positive following the 4Q20 earnings call, given the potential tailwinds highlighted by mgmt. [sic], including the better than expected enrollment of [Customer A] members" and "mgmt's comments indicate minimal risk of further customer losses."  Another analyst noted that "[m]gmt also pointed to early success with [Customer A]; it had estimated [Customer A] could add $40M of revenue in '21 and is now saying it 'appears to be moving faster than that.'"  The analyst also stated that Customer B "Issues Appear Isolated" and that "[p]er mgmt., there have been no subsequent concerns from any existing or prospective customers."

42.     On a May 6, 2021 earnings call, when an analyst asked for an update on Ontrak's relationship with Customer A, an Ontrak officer stated:  "We know what their overall total budget was, which was $90 million over 3 years and ultimately, expect that—believe and expect that we're going to be within that range at least."  Another analyst asked if a budget increase for Ontrak's contract with Customer A was still possible, and an Ontrak officer replied:  "The way I would answer that is yes. . . . conversations continue with all our customers and making sure that we're meeting their expectations and trying to grow the business reasonably and proving our business model is working for them along the way."

43.     From January 1 to March 31, 2021, revenue from the contract with Customer A represented 38.4% of Ontrak's total revenue.

44.     From April 1 to June 30, 2021, revenue from the contract with Customer A represented 52.3% of Ontrak's total revenue.

45.     From July 1 to September 30, 2021, revenue from the contract with Customer A represented 50.8% of Ontrak's total revenue.

**C.     Peizer Learned That Customer A Was Considering Ending its Contract**

46.     By late March 2021, Peizer had learned that Customer A was not satisfied with Ontrak's services and considering terminating its contract.  Customer A communicated this information to Ontrak's CEO, who regularly apprised Peizer of all events concerning Ontrak's relationship with Customer A.

47.     For example, on March 29, 2021, Ontrak's CEO texted Peizer that there was "[a] lot of worry around the company about [Customer A]."

48.     On March 30, 2021, Customer A's Chief Medical Officer ("CMO") texted Ontrak's CEO that Customer A was "[s]truggling with Ontrak," and then called Ontrak's CEO to discuss the situation.  After the call, Ontrak's CEO texted Peizer, "I just received a call from [CMO] at [Customer A]. Can give an update when we connect."

49.     On March 31, 2021, Peizer texted Ontrak's CEO, asking for any new updates on the situation with Customer A and stating he was "fixated on it."

50.     That same day, Ontrak's President emailed Ontrak's CEO, copying Peizer, "Thank you so much for agreeing to step in and help with [Customer A] . . . [Customer A] has raised concerns on three topics: 1. The increased enrollment rates well above expectations on both sides is creating a budget crunch for them . . . 2. They are concerned about when they will see the savings, that they aren't seeing them yet and that they may not meet a savings target they committed to . . . 3. Our impactable cost calculations are not really an impactable cost and include multiple procedures/conditions that are not impactable in our program, so it results in a) people making it into the program that shouldn't, and b) when we reconcile economics we are getting 'credit' for savings that

are not related to the program."

51.    Throughout April 2021, Peizer communicated with numerous individuals at Ontrak about the importance of saving the Customer A relationship.  For example, on April 3, 2021, Peizer texted an Ontrak consultant and close confidant: "We just need to save [Customer A] and we are on our way."

52.    On April 14, 2021, Peizer again texted the consultant that Ontrak's CEO "needs to still save [Customer A]!"

53.    The next day, Peizer texted Ontrak's CEO: "Please just save [Customer A]…then we will get back 'Ontrak.'"

54.    On April 18, 2021, Ontrak's CEO emailed a report to Peizer and the Ontrak Board of Directors, which stated, "Its [sic] imperative that we prioritize the stabilization of [Customer A], who is currently conducting a performance evaluation on our program and costs."  The report laid out an action plan to "increase our efforts to stabilize the relationship with [Customer A]," including "meetings occurring daily for 1.5 hours with a small executive group to work the action plans with urgency."  The report noted, "We anticipate we will be asked to reassess the contract, as the discussions with [Customer A] evolve over the next several weeks."  The report also informed Peizer and the Board that an expected expansion of the contract with Customer A "will likely be paused while program evaluation occurs."

55.    On April 22, 2021, the Ontrak consultant told Peizer, "I let [Ontrak's CEO] know that you have a high level of interest in all things [Customer A]."  That same day, Ontrak's CEO met with Peizer to give him a comprehensive update on Ontrak's relationship with Customer A.

56.    On April 24, 2021, the Ontrak consultant told Peizer, "I spoke to [Ontrak's CEO] last night and agreed that with so much major news unfolding with [Customer A] he might want to have a 1:1 meeting with you every week."

57.    That same day, after learning that Customer A had postponed a meeting with Ontrak, Peizer texted the consultant: "This feels eerily like [Customer B]."

58.     By April 27, 2021, Customer A had informed Ontrak's CEO that it would not be able to continue under the terms of the current contract.  On information and belief, Ontrak's CEO informed Peizer of this fact at the time.

59.     On April 29, 2021, Customer A's CMO informed Ontrak's CEO that Customer A would be slowing down enrollment of its members in the Ontrak program.  Whereas Customer A had previously sent monthly lists of over 2,000-4,000 members to Ontrak for potential enrollment, in April 2021, Customer A sent a list of only 51 members.  Because Customer A paid Ontrak a fee for each member enrolled in the Ontrak program, slowing down enrollment reduced Ontrak's revenue from the contract.

60.     On April 30, 2021, Ontrak's CEO emailed Peizer: "I feel the need to push and escalate the discussion inside [Customer A], I know it comes with the risk of alienating [Customer A's CMO] but I want to make sure that they are organizing to support us and it just does not feel like a priority on their side."  Peizer texted a copy of the email to the consultant, noting, "Doesn't sound optimistic."  The consultant did not reply and the next day, Peizer texted, "You uncharacteristically didn't comment on [the Ontrak CEO's] email?"  The consultant responded, "I was trying to think of something wildly optimistic to say, but found myself searching for data!"  Peizer wrote, "That's what I'm afraid of.  What a nightmare."

61.     On May 2, 2021, after sharing a draft with Peizer, Ontrak's CEO emailed the Customer A team with substantial fee concessions and other proposals to address Customer A's dissatisfaction with the Ontrak agreement.  Two days later, Customer A responded that they were "meeting internally and will get a meeting scheduled with you in the upcoming weeks."

62.     On May 10, 2021—the same day that Peizer established a Rule 10b5-1 trading plan to sell Ontrak stock, as discussed below—Peizer emailed Ontrak's CEO, "Any read of the tea leaves?"  Ontrak's CEO responded, "No.  [Customer A's CMO] has been playing it very close to the vest.  I have reach outs into [Customer A's President of Medicare Services] to see what else I can learn."

63.     The same day, Peizer texted Ontrak's CEO, "Are you close enough to [Customer A's President of Medicare Services] to visit him?"  Ontrak's CEO replied that "[i]f he is willing to meet I'll meet him in either Corp office or in DC."

### D.     Peizer Established a Rule 10b5-1 Trading Plan in May 2021 While in Possession of Material, Nonpublic Information

64.     Federal securities law prohibits corporate insiders from trading company securities while aware of material nonpublic information.  Because corporate insiders are regularly exposed to material nonpublic information, those who wish to sell a portion of their holdings are at risk of violating insider trading laws, if they trade in advance of this information becoming public.  During the relevant period, Exchange Act Rule 10b5-1(c)(1) outlined procedures that, if followed, provide an affirmative defense against allegations of illegal insider trading.  This defense is intended to allow corporate insiders to plan securities transactions in advance, at a time when they are not aware of material nonpublic information, and then carry out those pre-planned transactions at a later time, even if they later become aware of material nonpublic information.

65.     To qualify for the protection under Rule 10b5-1(c)(1) (as in effect at the time), corporate insiders enter into a contract that instructs a broker-dealer to execute trades on their behalf according to a written plan, known informally throughout the industry as a "10b5-1 plan."  Through the Rule 10b5-1 plan, the insider specifies a set of instructions by which trades are to be made, such as the number or value of shares to be sold, the frequency of the sales, and the prices of the sales.

66.     To take advantage of the affirmative defense under the version of Rule 10b5-1(c)(1) in effect at the time, a corporate insider who sells stock pursuant to a Rule 10b5-1 plan must demonstrate that they adopted the plan *before* becoming aware of material nonpublic information.  They must also demonstrate that the plan was adopted in good faith, and not as part of a scheme to evade insider trading prohibitions.

67.     The longer the period of time between the date that a trading plan is adopted and the date of the first transaction to be executed under the plan—the "cooling off

period"—the less likely that a corporate insider can benefit from material nonpublic information, because any such information they have is more likely to become public or stale during that waiting period.  Conversely, the shorter this period of time, the more likely an insider could benefit from material nonpublic information.  During the Relevant Period, Rule 10b5-1(c)(1) did not require a cooling off period.  In December 2021, the SEC proposed amendments to Rule 10b5-1(c)(1) requiring specified cooling off periods to reduce the ability of corporate insiders to trade on material nonpublic information; the SEC adopted these and other amendments in December 2022.

68.     At the same time that Peizer was communicating with others at Ontrak about saving the relationship with Customer A, he was pursuing a plan to sell shares of Ontrak securities.  On May 3, 2021, Peizer contacted one of his brokerage firms ("Broker 1") to set up a purported Rule 10b5-1 plan.  Peizer explained in an email: "I have 685,929 . . . warrants that expire August 15th-30th.  I want to do a plan to sells 10,000 shares a day (~68 trading days).  We report our Q1 numbers Thursday after the close and our window opens up Friday after the close.  My intent is to exercise the warrants, and file the plan."

69.     On May 4, 2021, an employee at Broker 1 emailed Peizer, "The earliest plan adoption date would be May 10th with a subsequent trading date of June 8th (30 day cooling off period.)"  Peizer responded, "If you require a 30 day 'cooling off' period it will really will [sic] condense the sales and have a more negative share price impact.  It is my understanding that there is no SEC requirement for the 30 day cooling off period.  I presume this is a[] [brokerage firm] rule?"  The employee replied, "Yes this is a[] [brokerage firm] rule.  They can bring the cooling off period down to 14 days, but having no cooling off is not negotiable."

70.     Peizer did not establish a Rule 10b5-1 plan at Broker 1, which would have required at least a 14-day cooling off period before he could start selling stock.  Instead, Peizer looked for a brokerage firm that did not have such restrictions.

71.     On May 4, 2021, Peizer texted a brokerage employee at Broker 2, "When you execute 10b5-1 plans, once the plan is filed, does [your brokerage firm] have a

cooling off period?"  The employee responded, "It has been our experience that the cooling off period is dictated by the company."  Peizer replied, "agreed."

72.    Upon determining that Broker 2 did not require a cooling off period, but would allow him to start selling stock immediately after establishing a Rule 10b5-1 plan, Peizer moved forward in setting up a purported Rule 10b5-1 plan at Broker 2.

73.    On May 10, 2021, another employee at Broker 2 emailed Peizer that "it is an industry best practice to insert a 30-day 'cooling off' period between the time of the execution of the plan and the commencement of trading."

74.    Despite this recommendation from Broker 2, Peizer disregarded that advice in favor of a plan with no "cooling off" period.

75.    On May 10, 2021, Peizer established a purported Rule 10b5-1 trading plan (hereinafter, "the May Trading Plan") in the name of Acuitas, his personal investment vehicle.  Peizer executed the plan using a web-based electronic signature platform.  The plan provided directives for the sale of 596,357 shares of Ontrak common stock, which Acuitas received on May 10, 2021 by exercising warrants set to expire on August 15, 2021 and August 30, 2021.

76.    Specifically, the May Trading Plan instructed Broker 2 to sell 11,000 shares of Ontrak common stock per day at the volume weighted average price ("VWAP") (or more shares per day at specified limit prices), starting on May 11, 2021—the first business day after the May Trading Plan was established.

77.    In the May Trading Plan, Peizer represented that he was "not aware of any material nonpublic information concerning the Issuer or its securities."  This was false. By the time he established the plan, Peizer was aware that Ontrak's contract with Customer A—its largest customer, representing over two-thirds of its business—was in serious jeopardy, as discussed *supra* at ¶¶ 46-63.

78.    Peizer knew, or was reckless in not knowing, that Ontrak's Insider Trading Policy prohibited securities transactions and the adoption of Rule 10b5-1 plans while in possession of material nonpublic information, and specifically defined the termination of

a material contract as an example of material nonpublic information.

79.     Peizer implemented the May Trading Plan, which had no cooling off period, just six days after he contacted Broker 2 about setting up such a plan.  The May Trading Plan was also the first time Peizer ever used a Rule 10b5-1 plan to trade in Ontrak securities.  The last time that Peizer had sold Ontrak securities was nearly ten years before, in December 2011, and Peizer had sold those securities without a Rule 10b5-1 plan.

80.     Prior to the May Trading Plan, Peizer had also never sold Ontrak common stock that he obtained through warrant exercises.  In May 2015, Peizer caused an entity he controlled to exercise warrants to purchase 15,726,972 shares of Ontrak common stock.  Peizer caused the entity to hold, and not to sell, that common stock.

### E.     **Peizer Sold Ontrak Stock Pursuant to the May 2021 Trading Plan**

81.     From May 11, 2021 through July 20, 2021, Peizer, through Acuitas, sold 596,357 shares of Ontrak common stock pursuant to the May Trading Plan for total proceeds of $19,213,497.

### F.     **In May-August 2021, Peizer Learned Material Nonpublic information Regarding the Customer A Agreement**

82.     On a May 18, 2021 call, Customer A notified Ontrak's CEO of its intention to terminate its contract effective December 31, 2021.

83.     That same day, Ontrak's CEO notified Peizer via text message: "Customer A is intending to end relationship at the end of the year 12-31-21….They are really firm with me. **Decision has been made.**"  (emphasis added).

84.     Throughout the spring and summer, Ontrak continued to reach out to Customer A with various proposals and further fee concessions to attempt to salvage the contract.  Customer A did not respond substantively to these proposals, and put off Ontrak's requests for conference calls to discuss the proposals.  Ontrak's CEO and other Ontrak employees kept Peizer apprised of these interactions with Customer A.

85.     For example, on May 25, 2021, Ontrak's CEO forwarded to Peizer an email he had sent to Customer A proposing restructuring the contract and including significant

fee concessions.

86.     Peizer texted an Ontrak consultant about the Ontrak CEO's email to Customer A, "I'm so pissed.  His note isn't accurate.  How did he not share this first . . . Although it did come Across [sic] diplomatic . . . But it didn't even say we believe in our program so much we will guarantee savings and also go at risk.  Maybe it's an opening bid.  But 'm [sic] upset.  I've lost personally $700 mill of value and not even a discussion about this."

87.     On June 7, 2021, Peizer texted an Ontrak consultant, "[Customer A] causes me anxiety."

88.     On June 11, 2021, Peizer texted the Ontrak consultant that Ontrak's CEO "is saying that [the Ontrak sales employee with primary responsibility for Customer A ("Ontrak Sales Employee"] isn't getting any engagement" with Customer A.  Peizer went on, "I was cautiously really optimistic after our cal [sic] last night" and included a face palm emoji.  Peizer texted, "[Ontrak's CEO] is so negative."  The consultant texted back, "I think [Ontrak's CEO] is bummed that after promises from [Customer A executives] of engagement it's going so slowly.  The question is are they moving slowly because they are working against us or just plain busy with other work?"

89.     On June 16, 2021, Peizer texted the Ontrak consultant, "If we can just keep [Customer A] we will merge [with another company]…who knows what happens otherwise."

90.     On June 28, 2021, Peizer texted the Ontrak consultant, "We just need to save [Customer A] or get [Customer B] onboard and I will do a deal with [another company]."

91.     Beginning in July 2021, Customer A stopped sending any members to Ontrak for enrollment.

92.     On July 7, 2021, the Ontrak consultant texted Peizer, "No news from [Customer B] or [Customer A], so budget cuts continue and frontline folks are anxious."

93.     On July 11, 2021, Peizer texted the Ontrak consultant, "Good morning!  Any [Ontrak Sales Employee] updates?" and included an emoji gritting its teeth.  The

consultant responded, "Morning!  Nope.  All quiet from [Customer A].  Hope they are back this week and able to engage with us."

94.    On July 15, 2021, Peizer texted the Ontrak consultant, "No [Ontrak Sales Employee] communication with [Customer A]"?  The consultant replied, "Not as of this morning.  They are really throttling members being sent to us.  It's a trickle at this point."

95.    On July 16, 2021, Ontrak laid off certain employees.  Ontrak explained the layoffs in an internal memo: "Our outreach and enrollment pools are not growing as fast as needed to support the staffing that is currently in place."

96.    On July 20, 2021, Peizer texted the Ontrak consultant, "anything new in Ontrak? [Ontrak Sales Employee] have any more info?"  The consultant responded, "Nothing new on [Customer A] . . . have to hop back into the monthly [Ontrak] meeting and write the earnings release – will the fun never end?"  Peizer replied, "no, but I wish the anxiety would."  The consultant texted, "Me too – stress levels are off the charts at [Ontrak]."

97.    On August 13, 2021—the same day that Peizer set up a second Rule 10b5-1 trading plan to sell Ontrak stock, as discussed below—Peizer called the Ontrak Sales Employee and asked if Customer A was going to terminate the contract.  The Ontrak Sales Employee indicated to Peizer that he thought Customer A would terminate.

### G.    Peizer Established a Second Rule 10b5-1 Trading Plan in August 2021 While in Possession of Material, Nonpublic Information

98.    On August 10, 2021, Peizer contacted Broker 2 by phone and email to set up another purported Rule 10b5-1 trading plan to sell more Ontrak stock.

99.    On August 13, 2021, Peizer established a purported Rule 10b5-1 plan in the name of Acuitas (hereinafter, the "August Trading Plan").  Peizer executed the plan using a web-based electronic signature platform.  The plan provided directives for the sale of 463,567 shares of Ontrak common stock, which Acuitas received on August 13, 2021 by exercising all remaining warrants it owned, which were set to expire between December 15, 2021 and April 13, 2022.

100.   Specifically, the August Trading Plan instructed Broker 2 to sell 11,000 shares of Ontrak common stock per day at the VWAP (or more shares per day at specified limit prices), starting the next trading day, August 16, 2021.

101.   In an internal email between Broker 2 employees, one stated that he "always recommend[s] 30 day cooling off, but for Terren [Peizer] that won't work."

102.   In the August Trading Plan, Peizer again falsely represented that he was "not aware of any material nonpublic information concerning the Issuer or its securities."  In fact, Peizer was aware, among other things, that Customer A had notified Ontrak that it intended to terminate the contract, that Customer A had not engaged in Ontrak's attempts to renegotiate the contract, that Customer A had stopped sending any of its members for enrollment in Ontrak's program, and that the Ontrak Sales Employee responsible for the relationship with Customer A believed Customer A would indeed formally terminate its contract with Ontrak.

103.   Peizer knew, or was reckless in not knowing, that Ontrak's Insider Trading Policy prohibited securities transactions and the adoption of Rule 10b5-1 plans while in possession of material nonpublic information, and specifically defined the termination of a material contract as an example of material nonpublic information.

104.   As discussed below, the establishment of this new, additional plan occurred just days before Customer A formally notified Ontrak that it was officially terminating the contract, effective December 31, 2021.

### H.   Peizer Sold Ontrak Stock Pursuant to the August 2021 Trading Plan

105.   Pursuant to the August Trading Plan, from August 16, 2021 through August 18, 2021, Peizer and Acuitas sold 45,000 shares of Ontrak common stock for total proceeds of $1,977,752.

106.   From August 19, 2021 (when Ontrak announced Customer A's termination of the contract, as discussed further below) through September 28, 2021, Peizer and Acuitas sold the remaining 418,567 shares of Ontrak common stock pursuant to the August Trading Plan.

## I.    Ontrak's Stock Fell 44% after the Termination Announcement

107.    On August 18, 2021, Customer A notified Ontrak's CEO on a telephone call that it was terminating the contract, effective December 31, 2021.  Ontrak's CEO called Peizer immediately and informed him of Customer A's termination.

108.    The next day, Customer A sent a letter to Ontrak's CEO via email and certified mail, stating that pursuant to a provision of the customer agreement, Customer A was "hereby exercising its right to terminate."

109.    On August 19, 2021, prior to the open of trading, Ontrak publicly disclosed in an interim report filed on Form 8-K with the SEC that "[o]n August 18, 2021, we were notified by a customer of their intent not to continue the program past December 31, 2021."  Ontrak did not disclose the identity of the customer in this filing, though, in actuality, it was Customer A.

110.    In that interim report filed on Form 8-K, Ontrak further stated:  "From the inception of the contract in July 2020, we have billed this customer approximately $42 million of the previously expected 3-year $90 million contract.  We do not expect this decision to have a material negative impact on our previously stated revenue and margin expectations for FY 2021 and the decision does not materially change our existing outreach pool.  We currently expect our diversified portfolio of remaining customers under existing contracts to contribute nearly $50 million of revenue in 2022 . . ."

111.    Ontrak's estimated 2022 revenue of $50 million was far lower than analysts' prior 2022 revenue estimates, before the Customer A termination was announced, of about $118 million.  Thus, while Customer A's termination did not materially impact Ontrak's 2021 revenue, it resulted in a 57% decrease in expected 2022 revenue.

112.    At the end of trading on August 19, 2021, following the announcement of Customer A's termination, Ontrak's stock price closed at $11.68 per share, down $9.37, or more than 44%, from the prior day, on exponentially higher volume of 4,508,900 shares.

113.    On February 27, 2023, Ontrak stock closed trading at $0.6795.

### J. Peizer and Acuitas Avoided Losses by Selling Ontrak Stock Ahead of the Announcement of Customer A's Termination

114. By selling Ontrak stock before Ontrak announced that Customer A had terminated its contract on August 19, 2021, Peizer and Acuitas avoided losses of at least $12,711,324—representing the difference between the value of the Ontrak shares when sold and the August 19th closing price of $11.68.

### K. Peizer and Acuitas Traded on the Basis of Material Nonpublic Information

115. Peizer was aware of material nonpublic information about Ontrak when he adopted the May Trading Plan to sell Ontrak stock. Specifically, Peizer was aware that Ontrak's contract with its largest customer—representing over half of its business—was in serious jeopardy, by virtue of the fact that: (1) Customer A had expressed dissatisfaction with Ontrak's program; (2) Customer A informed Ontrak that it could not continue under the current contract; (3) Customer A had drastically cut down the list of its members that could be enrolled in the Ontrak program; and (4) Ontrak's CEO had sent proposed fee and other concessions to try to salvage the relationship. Peizer understood that the situation was dire. In the month before adopting the May Trading Plan, Peizer sent at least three text messages about the need to "save" Customer A. Peizer also noted that the situation "feels eerily like [Customer B]," which had terminated its contract with Ontrak just two months prior. And after an update on the situation with Customer A from Ontrak's CEO, Peizer wrote "[d]oesn't sound optimistic" and "[w]hat a nightmare." Just three days after sending that text, Peizer reached out to a brokerage firm to set up a purposed Rule 10b5-1 plan.

116. Peizer was also aware of material nonpublic information when he adopted the August Trading Plan to sell Ontrak stock. In addition to the information Peizer was aware of when adopting the May Trading Plan, Peizer was aware that Customer A had notified Ontrak of its intention to terminate the contract. On May 18, 2021, Ontrak's CEO notified Peizer via text message: "[Customer A] is intending to end relationship at

the end of the year 12-31-21 . . . They are really firm with me.  Decision has been made."  Peizer was also aware that Customer A was not responding to Ontrak's efforts to salvage the relationship, that Customer A stopped sending any members for enrollment in Ontrak's program, and that the Ontrak Sales Employee interfacing with Customer A believed that Customer A would formally terminate the contract.

117.   Peizer also knew, or was reckless in not knowing, that information concerning the serious jeopardy of Ontrak's contract with Customer A, Ontrak's then-largest customer, was material nonpublic information pursuant to the terms of Ontrak's Insider Trading Policy in effect at the time.  Indeed, that Insider Trading policy specifically included as an example of material nonpublic information a "[m]aterial agreement (or termination thereof)" just like the facts described herein regarding Customer A.

### L.   Peizer and Acuitas Acted with Scienter

118.   Peizer knew, or was reckless in not knowing, that he owed Ontrak and its shareholders a duty not to use confidential company information for his personal gain.

119.   Peizer knew, or was reckless in not knowing, that the information he had access to about Customer A's likely termination of its contract with Ontrak was material and nonpublic.  Peizer knew that when Ontrak had announced that Customer B had terminated its contract in March 2021, Ontrak's stock price dropped nearly 50%.  Peizer knew that, particularly after Customer B's termination, Ontrak's relationship with Customer A was of paramount importance to Ontrak.  In the press release announcing the termination of Customer B's contract and the March 2021 earnings call, Peizer pointed to Ontrak's growing relationship with Customer A as making up for the loss of Customer B.  Peizer knew that, after Customer B's termination, Customer A's members made up more than half of the enrollees in Ontrak's program and Customer A contributed over half of Ontrak's total revenue.  Peizer's repeated pleas to "save" Customer A also show Peizer's awareness of the importance of the Customer A contract to Ontrak.

120.   Peizer also knew, or was reckless in not knowing, that information

concerning the serious jeopardy of Ontrak's contract with Customer A, Ontrak's then-largest customer, was material nonpublic information pursuant to the terms of Ontrak's Insider Trading Policy in effect at the time.  Indeed, that Insider Trading policy specifically included as an example of material nonpublic information a "[m]aterial agreement (or termination thereof)" just like the facts described herein regarding Customer A.

121.   Peizer knew, or was reckless in not knowing, that his representation in the May Trading Plan and August Trading Plan that he was not aware of any material nonpublic information about Ontrak or its securities was false.

122.   Peizer knew, or was reckless in not knowing, that he was prohibited from adopting a Rule 10b5-1 plan to sell Ontrak securities while he was aware of material nonpublic information about Ontrak.  Peizer was Executive Chairman, and formerly CEO, of Ontrak, which had in place an insider trading policy prohibiting directors and officers with access to material nonpublic information related to Ontrak from using that information for stock trading purposes or for personal financial benefit.  In order to adopt the May Trading Plan and August Trading Plan, Peizer was required to represent that he was not aware of any material nonpublic information about Ontrak or its securities.

123.   Peizer sold Ontrak stock in haste in order to avoid losses before Customer A formally terminated its contract and that information became public, sending the price of Ontrak stock significantly lower, as had happened with Customer B.  Peizer declined to adopt a Rule 10b5-1 plan with Broker 1, which required at least a 14-day cooling off period.  Instead, Peizer found a brokerage firm, Broker 2, that allowed him to start selling stock immediately after adopting a trading plan.  Although Broker 2 informed Peizer that it was industry best practice to include a 30-day cooling off period between the adoption of the plan and the commencement of selling, Peizer opted for no cooling off period in either the May Trading Plan or August Trading Plan.

124.   Moreover, Peizer chose to exercise the warrants Acuitas held before they expired, and, rather than holding the common stock obtained from those warrant

exercises, Peizer chose to sell all Ontrak stock received from the exercise of those warrants as quickly as possible.

### M.   Rule 10b5-1 Offers No Affirmative Defense to Peizer or Acuitas

125.   According to Rule 10b5-1(c)(1)(ii), the affirmative defense of Rule 10b5-1 is only available if the trading arrangement was entered into before the person became aware of material nonpublic information, and it was entered into "in good faith and not as part of a plan or scheme to evade the prohibitions" of the rule.

126.   On the facts alleged throughout this Complaint, Peizer and Acuitas did not meet the requirements for the Rule 10b5-1(c)(1) affirmative defense.  As alleged above, Peizer established the May Trading Plan and August Trading Plan while he was aware of material nonpublic information about Ontrak.  Further, he did not adopt the plans in good faith, but as part of a scheme to evade insider trading prohibitions.

### FIRST CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (against Defendants Peizer and Acuitas)

127.   Paragraphs 1 through 126 are realleged and incorporated by reference as if fully set forth herein.

128.   As set forth above, defendants Peizer and Acuitas traded Ontrak securities on the basis of material, nonpublic information about Ontrak in violation of Peizer's duty of confidentiality to Ontrak.  Defendants knew, consciously avoided knowing, or were reckless in not knowing that this information was material and nonpublic.

129.   By engaging in the conduct described above, defendants Peizer and Acuitas, directly or indirectly, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange:  (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which

operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

130.   By engaging in the conduct described above, defendants Peizer and Acuitas violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule thereunder, 17 C.F.R. § 240.10b-5.

## SECOND CLAIM FOR RELIEF

### Control Person Liability under Section 20(a) of the Exchange Act
### (alternatively, against Defendant Peizer)

131.   Paragraphs 1 through 126 are realleged and incorporated by reference as if fully set forth herein.

132.   As alleged above, Defendant Acuitas violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

133.   During the Relevant Period, Defendant Peizer, as Chairman, sole member, and 100% owner of Acuitas, exercised control over the management, general operations, and policies of Acuitas, as well as the specific activities upon which Acuitas' violations are based.

134.   By reason of the foregoing, Defendant Peizer is liable as a control person under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), for Acuitas' violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

135.   Unless restrained and enjoined, Peizer will continue to engage in conduct that would render him liable, under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), for violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, 17 C.F.R. § 140.10b-5.

## THIRD CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act
### (against Defendants Peizer and Acuitas)

136.   Paragraphs 1 through 126 are realleged and incorporated by reference as if

1 fully set forth herein.

2     137.  By engaging in the conduct described above, defendants Peizer and Acuitas,

3 singly or in concert with others, in connection with the offer or sale of securities, by use

4 of the means or instrumentalities of interstate commerce, or of the mails, or a facility of a

5 national securities exchange, directly or indirectly: (a) employed devices, schemes, or

6 artifices to defraud; (b) made untrue statements of material fact or omitted to state

7 material facts necessary in order to make the statements made, in light of the

8 circumstances under which they were made, not misleading; or (c) engaged in acts,

9 practices, or courses of business which operated or would have operated as a fraud or

10 deceit upon persons.

11     138.  By engaging in the conduct described above, defendants Peizer and Acuitas,

12 violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the

13 Securities Act, 15 U.S.C. § 77q(a).

14 **PRAYER FOR RELIEF**

15     WHEREFORE, the Commission respectfully requests that the Court enter Final

16 Judgments:

17 **I.**

18     Permanently enjoining Defendants Peizer and Acuitas, and those persons in active

19 concert or participation with any of them, who receive actual notice of the judgment by

20 personal service or otherwise, and each of them, from violating Section 17(a) of the

21 Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. §

22 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

23 **II.**

24     Ordering Defendants to disgorge all ill-gotten gains obtained within the statute of

25 limitations,  together with prejudgment interest thereon, pursuant to Section 21(d)(3),

26 (d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5) and

27 78u(d)(7)].

28 ///

### III.

Ordering Defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

### IV.

Ordering that Defendant Peizer be barred from serving as an officer and director of a public issuer pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

### V.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

### VI.

Grant such other and further relief as this Court may determine to be just and necessary.

### DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, the Commission demands trial by jury.

Dated:  March 1, 2023

/s/ Stephen T. Kam
Stephen T. Kam
Dean M. Conway
Kevin Guerrero
Emily Shea
Attorneys for Plaintiff
Securities and Exchange Commission